Let's turn to the next case on the calendar 20-3837CV, Knight First Amendment Institute v. U.S. Citizenship and Immigration Services, et al. I understand we have Ms. Blaine for the appellant. Yes, Your Honor. And we have Ms. Crump for the appellee, and you can both hear us. Yes, Your Honor. Very good. And Ms. Blaine, I understand you would like to reserve three minutes for rebuttal. Is that right? Yes, thank you, Your Honor. Very good. You may proceed. Thank you. May it please the Court, my name is Ellen Blaine. I'm an Assistant United States Attorney in the Southern District of New York, and I represent the defendant agencies in this matter. At the heart of the case is the ability of two federal agencies to enforce the law and, as required by Congress, to prevent potentially dangerous individuals from entering the United States. Both the State Department and USCIS are charged with the responsibility of screening foreign nationals who seek to enter this country to determine, among other things, whether they have ties to terrorism. But the District Court has ordered the release of documents that are, in effect, the government's playbook for making that determination. If given access to these documents, terrorists and other bad actors could potentially evade detection, gain entry to the United States, and pose a threat to national security. The materials that issued here, Your Honor, are in Volume 9 of the State Department's Foreign Affairs Manual and in materials that USCIS uses to train immigration officers. Both agencies have logically and plausibly explained that Exemption 70 applies here because the documents provide detailed instructions to visa and immigration other terrorist-related activity or subject to one of the multiple exemptions from such a bar. May I ask you, counsel, to understand the, perhaps, limits of the argument you're advancing. Every application for a government benefit, I would assume, is accompanied by guidelines that one seeks government housing or social security benefits or almost anything else. There's an interest, certainly, in not giving them to people who are engaged in fraud or are otherwise ineligible. To conclude that that's all law enforcement would basically shield enormous amounts of government materials. Are you saying that that is what we should find, or is this a narrower argument that you're advancing here? Your Honor, this is a narrower argument. The argument does not go as far. There are limits then. There are limits, and the reason that this is distinct from a routine determination, such as a social security benefit or any other sort of government benefit, because while entering the country may be a benefit, the agencies here are doing something more, which is at the threshold. They are determining whether or not those individuals who seek to get that benefit are a national security threat. They are enforcing specific directives that Congress gave them in Section 212 of the INA. Specifically, as to the State Department, Section 212 of the INA directs consular officers, employees of the State Department, to look for, for example, whether that individual is associated with 42 currently designated foreign terrorist organizations, whether that individual is engaged in other very broadly defined terrorist activities, such as soliciting funds for a particular organization, providing material support for a particular organization, or whether that individual is entitled to admission based on an exemption to one of those multiple bars. These are very detailed and specific procedures that consular officers have to follow, and they fall squarely within a law enforcement function distinct from a typical government immigration benefit. Well, does that mean that guidance to consular offices as to visa eligibility in other areas would be law enforcement or would not be law enforcement? I mean, is there something unique about the terrorism component here that brings it within law enforcement or not? Your Honor, the documents at issue at this case only deal with terrorism-related concerns under Section 212A3B of the INA. Now, that's not to say that every visa applicant, or rather that other visa applications are not subject to a national security screen. Every single time a visa applicant applies for a visa to a consular officer, that consular officer is mandated by Section 212 to screen for certain inadmissibility bars. Those bars include, for example, not just terrorism-related exclusions, but whether that individual is a member of a totalitarian party, whether that individual poses a serious adverse foreign policy consequence to the United States, whether that individual traffics in controlled substances or traffics in people. Those are all distinct evaluations that Congress has mandated the State Department do for every single visa are particularly focused on terrorism-related ineligibilities and other serious adverse foreign policy consequences should terrorists enter the United States. That is a congressional law enforcement determination. So just to be clear, I think I understand your argument is that these are all terrorism-related screenings and are definitely therefore within the law enforcement zone. There may be other things, for example, making sure you're not part of a narcotics distribution organization, whatever, that might also fall within the law enforcement zone that would also be screening, but you're not necessarily suggesting that everything that one does to screen a visa applicant necessarily falls within law enforcement by definition. Well, Your Honor, I believe the State Department would argue that every single visa application does involve a degree of security awareness. Well, no, I know that, but like if you're checking someone, I don't know. I don't know. It's hard to come up with a hypothetical, but are you suggesting that every part of every visa application is necessarily within that national security umbrella, or are you saying that there may be some things that are and some things that aren't? Your Honor, I'm saying that the court doesn't need to reach that far. The court only needs to reach the issues that are withheld here, the documents and the information that is withheld here. And what is withheld here is clearly squarely within a law enforcement function because it deals with terrorism-related ineligibilities. It would be no more vital function for a federal agency than to screen for potential terrorists and prevent a potential terrorist attack on our soil. And then, again, just so I can be clear that I understand the question, what you're suggesting is what the government would ask us to hold is that these issues at all, because they have a terrorist nexus, definitely fall within the ambit of this particular exemption relating to national security law enforcement, and that such a holding would not necessarily entail a finding one way or the other that all aspects of all visa screening necessarily also fall within that exemption. Yes, Your Honor, we're focused on these particular exemptions, but I just will note very quickly, and I realize I'm out of time, is that 212 directs consular officers to enforce the law in every single section of 212, not just A3B terrorism-related ineligibilities or A3C foreign policy consequences. So as Justice Alito said at the beginning of the question, we're focused on those steps that are designed to maintain security, and those steps designed to maintain security can include preventing individuals who traffic and control substances, for example, from entering the United States. I have a question, really following up on what Judge Raji asked, why wouldn't prevention of immigration fraud also be a law enforcement function? So that the questions that are asked to ascertain whether a person seeking a student visa is a student or studying something or knows the area, or whether somebody who is arriving to take up a job that is in demand in the hospital procedure is ill, why wouldn't all of those things also be law enforcement? Because you're enforcing the immigration laws against immigration fraud. Yes, and I think every context is very context-specific. Every example you gave is very context-specific. So let's take, for example, immigration fraud. Numerous courts have found that questions that USCIS poses to applicants seeking immigration benefits, for example, an H-1B visa, which allows individuals to enter the country under specific sort of professionalism, education background, screening for whether or not someone seeking that benefit based on fraud is a law enforcement technique that is squarely within 70. That's the TechServe case, and that is Abraham versus ICE. So those things are squarely within the law enforcement context. And here, whether or not screening an individual who seeks to have an operation at a hospital is somehow not entitled to that operation or that benefit is, I would say, further down the spectrum, far away from where we are here. And where we are here is a specific directive to consular officers to apply and enforce a national security directive. So you're saying that there is a spectrum, but we don't need to set or even think much about what the cutoff point is because this is so far along the spectrum of clear law enforcement to keep people out of the country who want to blow us up. Well, exactly. Exactly. The court need not reach further down the spectrum. This is really agency's core law enforcement functions, the most vital law enforcement functions facing any federal agency to protect the security of the United States. And these documents are, in effect, the playbook directing and giving information to the government about how to do that. And the fact that USCIS is withheld training materials underscores this point because it trains immigration officers how to spot terrorism ties. And if one were to reveal those documents, it would be to avoid being identified as one with a terrorism tie. May I ask one question about the other document, the memo that is at issue? I just want to ask counsel, we had directed to us the D.C. decision from last month in judicial watch versus Department of Justice. If we were to adopt the reasoning of that decision, would there have to be more inquiry as to what the deliberative process was involved in connection with this memo? What role the author played in the deliberative process? These seem to be points that the D.C. circuit thought had to be demonstrated by the government. What's your response to that, counsel? Thank you, Your Honor. Our response is that this memo needs no more evaluation because it contains, as ICE has attested, an employee's opinions about whether or not the Secretary of State can exercise- Well, we don't know if he was writing because he was disgruntled about something or whether this was genuinely going to be part of a deliberative process. And I emphasize that because, of course, this is done within ICE legal. It pertains to what the Secretary of State's authority was, so we're cross-agencies or cross-departments here. Do we need more information than we have? No, Your Honor. No, Your Honor. I'm sorry because- How do I know about how this figures in the deliberative process at the State Department? Well, if we're talking about whether or not this is pre-decisional versus deliberative, I think- I'll accept that for purposes of the argument. What do we know about how it plays into the deliberative process? Because that was something the D.C. Circuit thought was relevant tonight. Yes. In judicial watch. Right. What we know about where this fits in is this is clearly very early on in a process, a process by which ultimately the question is, can the Secretary of State, should the Secretary of State exercise her discretion under the statute? Now, this is obviously at the very initiation of the process because it is a draft. It is informal, unorganized, unsigned, not on agency letterhead. It is an employee within the Office of Principal Legal Advisors first blush, first attempt at addressing and grappling with this decision that the Secretary of State can make. One needs to look no further than that because as this court well knows, drafts and proposals can die on the vine. That doesn't mean that an initial proposal, initial draft loses its protection under Exemption 5 simply because nothing else followed it. And what we know here is there was an attorney within OPLA grappling with this decision. And as the Supreme Court has said in Sears, and this court again reiterated in our D.C., courts should be wary of interfering with an agency's continuing process of examining its policies. And that's because this particular document shows that employees need to have the freedom to express their opinions candidly. The court said it again in NRDC. The most important question, the key question this court wrote is whether disclosure would tend to diminish candor. Again, that's been followed in Teague. You're protecting the quality of the National Security Archive. You're trying to make sure that employees feel free to express their opinions. And this is exactly the type of pre-decisional, initially deliberative document that Exemption 5 is directed to protect. Protect candid initial views of agency officials when determining how the agency can apply the law, and particularly here, whether the Secretary can exercise her discretion under the statute. Okay. Thank you, Judge Nardini. Thank you. You have reserved three minutes. We kept you a little over time. But we'll come back. So, Ms. Crump, we'll get your video and audio back up. There you are. And Ms. Crump, you may proceed. Good morning, Your Honors. May it please the court. My name is Katherine Crump for Appley the Knight First Amendment Institute. I'd like to pick up where the court left off with Exemption 5 because of the new authority that has been introduced. The government has not established that the ICE memo is pre-decisional because it has not identified a decision-making process that led to the memo's creation. We know the would be to take certain actions. Isn't that pre-decision as to whether he's going to do that or not? No, Your Honor. Because of the interagency context you highlighted earlier, this is a memo by an ICE official discussing the Secretary of State's authority. How the Secretary of State makes use of the foreign policy provision is a decision for State, not ICE, to make. But it's a decision for the Secretary of State alone to make, right? And then the Secretary of State can get input from presumably the interagency process. Isn't that pretty standard? I mean, the fact that there's obviously one decision-maker at the end of the day who's the person at the apex of the pyramid doesn't suggest that the deliberative or the decisional process can only happen within a narrow channel, right? I guess I'm not understanding the question because if you take that position, then presumably there can be no deliberation or no decisional process that excludes the Secretary himself or that extends beyond the Secretary himself. He can only have his memos to himself. Your Honor, I agree with everything you say, but what this memo was for isn't in the record. The record doesn't contain, for example, that the Secretary of State was making a decision. So we don't know whether an ICE employee who authored this memo was simply seeking to understand the government's authority in general under the foreign policy provision or whether the employee did prepare the memo, for example, in an effort for ICE to lobby the Secretary of State to use its power. The Vaughn simply doesn't tell us, and without that information in the record, the government hasn't met its burden. Also, building on Judge Raji's questions about the deliberative process element, the government has not established that the memo is deliberative because it hasn't shown that the memo was actually related to the process by which policies are formulated. Although we know someone in the ICE Office of Principal Legal Advisor drafted the memo, we don't know who the memo was directed to, the stage of the deliberative process at which the memo was created, or how its content facilitated deliberations. And without describing the who, the what, the where... I think we may have just... I'm sorry. I think I at least just lost your audio. Yes. And I would apologize. Would you mind just repeating what you just said? I'm sorry. I'm sorry, Your Honor. Yes. I was just saying that without describing the who, the what, the how, as the D.C. Circuit put it in Judicial Watch, the government has not established that the memo is deliberative. And finally, my last point on this before moving on to the other records, what we do know about the record suggests that it very likely contains segregable information. This is a four-page memo, and all ICE disclosed was the title. So to the extent the ICE memo describes existing policy as to the foreign policy provision or included any factual description of ICE's or state's current practices, or describes the text or the history, that information should be segregated out and disclosed. Wasn't that ordered by the court? The court did order that, and the government appealed from that decision. So I'm asking you to affirm. So the government finds that there is... or advises, represents that there is... ...segregable portions that reflect current immigration policy. The government suggested it went on a line-by-line basis and didn't find anything to disclose, but we're relying on the contextual information of this being a four-page memo to argue that the district court was correct to order the government to take another look and see if there's additional information that should be disclosed. I'd like to talk a little bit about that, about the... Hold on. So the order we are reviewing is one that tells the government to take another look? As to this document, the government ordered, I believe... the court ordered, I believe, for the government to go back and see if there's segregable information to release. As for the trig questions, the district court was correct to order the government to disclose the USCIS trig questions for two reasons. First, USCIS has failed to carry its burden of showing that the questions are technical or specialized. The government has described these as model interview questions to see if any of the trig grounds apply, but the government has not established that there are any special methods or skill that would be revealed by disclosing the questions. But isn't the method the question themselves? That is the method. I mean, to say that if you disclose the method, there's no sort of method beyond it. I don't see... that's not the question, right? I mean, you're asking for the method itself to be revealed. Your Honor, other courts have concluded that screening questions, such as these general questions that are asked repeatedly, are not what constitutes a specialized technique or procedure. One important fact to note about the trig is that as the government's training materials themselves state, these are very broadly used. The trig covers a lot of ground. These are questions that are used in examinations done in many adjudications, from asylum to adjustment of status to lawful permanent residency, naturalization, or temporary protected status. Decisions have held that when questions are so widely asked and general, that they're not the kind of specialized technique or procedure that's properly withheld under exemption. These are designated as terrorism-related? Yes, Your Honor, but the legal standard under 7E doesn't have a terrorism carve-out. It's a broadly applicable... it's a broadly applicable standard. The government needs to show that there's a procedure being used here. And to go back to the... I'm afraid I have the same confusion or question as did Judge Nardini. I mean, the bar... we don't get a release of what the bar questions will be on the bar exam. If we did, people would do a lot better on the bar exam. But the technique is to ask challenging questions that are designed to elicit what the examiner needs to know. That's the technique. I don't know what else... I don't know what else there can be. Decisions such as ACLU v DHS have concluded that when questions are widely asked, they lose their protections under 7E. That's consistent with this court's prior... But they're not so widely asked that you know what they are, right? Yes, Your Honor, but that's not the standard. So, for example, in this court's decision in Schwartz, the court held that the government had to disclose a video of a drug interdiction raid where some, but not all, of the techniques and procedures have been revealed. And there's something fundamentally different about seeing the government document itself than word of mouth, even if the questions are widely known. Well, right, but that's the whole point, right? The idea is that if there were a document that could be posted on the internet saying, this is what the government will ask you when it's trying to figure out whether you're a terrorist, it seems like that's going to go right in whatever the latest publication of ISIS is on the web. It's going to be saying, hey, folks, when you're trying to sneak into the United States, here are the questions. So get your answers ready. I mean, isn't that kind of obvious? That's the technique. And it seems to me that our adversaries would immediately recognize it as the relevant technique. Your Honor, I think all I can do is to point you to the training manuals themselves and to highlight that these are broad trainings about TRIG and the redactions seem to consist of short general lists of questions. Not to provide the breadth matters in this circumstance. Law enforcement efforts with respect to terrorism would appropriately be applied wherever terrorism might be a concern. And so to that extent, all the various circumstances under which you've identified the use of these questions would seem to still be in a technique in order to enforce the laws with respect to terrorism. Am I missing something here? Yes, because these questions are really, our argument is that these questions are really widely asked in all of these contexts. And we take from the context of the training materials that these are general questions that hinge and are closely connected with the statutory language rather than revealing more specialized information. Finally, if I may have just a few more minutes, I'd like to talk about- Oh, please proceed. We've been asking you some questions, so please go on. Thank you, Your Honor. If I have a few more minutes, I'd like to touch on the foreign affairs manual. State has not established that it was compiled for law enforcement purposes as the threshold of exemption seven requires. State characterizes the FAM as a policy manual, distinguishing it from a handbook that addresses procedures. The records at issue are all documents that provide consular officers with guidance about how to make informed decisions on US immigration law when issuing visas. Consular officers are not enforcing the law. They're applying it to decide whether to grant or deny a visa. And the cases on enforcement that the government cites all involve decisions about whether to apply penalties, civil or criminal penalties, or some sort of national security penalty. So can I just ask you maybe to break this down into at least two questions that I think might be embedded in there. Are you arguing that the FAM, by virtue of what it is overall, by definition could never contain law enforcement materials? Or are you just saying that the materials at issue here aren't law enforcement? That's sort of my first question because I can't tell which of those two arguments you're making. Yes, Your Honor. We put an example of what we received from the FAM in the record. And as we see this document, state has characterized it as a general policy manual and not the type of thing that contains detailed techniques and procedures and law enforcement purposes. So, okay. So the answer to my first question, and I want to make sure I understand your question right, is by virtue of what the FAM is, nothing that's in it could possibly be law enforcement material, regardless of looking at the particulars of it, because of the way that the State Department has characterized the FAM overall. So is that your argument? One of your arguments, perhaps, maybe of alternative arguments. You know, we haven't said anything about the FAM writ large. We focused on volume nine. And when we review the contents of volume nine and look at what we have and where the redactions are, our view is that that material does not appear to be compiled for law enforcement purposes. Some of this foreign affairs manual has been produced to correct? Yes, Your Honor. And a fair amount of it is on the State Department's website as well. Well, you still asked for it, even though it's on the website. Some of it has been produced and other parts have been redacted. And even if I don't convince this court that this record is not compiled by law enforcement purposes, we then move on to point out specific areas where we don't think the techniques and procedures are correct. First of all, there are a number of redactions from a section which purports to describe the terms used in the INA in alphabetical order. We think that raises real questions about whether the government has redacted something that is, in fact, a technique and procedure. Second of all, we point to a number of instances in which government agencies have revealed more detailed records pertaining to the same subject matter that's contained in shorter form in the FAM. And our view is that the existence of those materials and the lack of explanation about the fact that the FAM contains more detailed information similarly indicates that the government has not met its burden. And finally, we point to a few examples in which the FAM's, the state's redaction claims are simply too vague and conclusory to carry its burden. For example, there's a Vaughn entry that reads, just procedures for finding and evaluating sources of information that provides no context that will allow the court to determine whether it truly protects a technique or procedure and the government needs to provide more information. So in short, we ask the court to affirm the ruling of the district court that these three sets of records should be released. I'm glad to ask you, you focused just now in your argument on techniques and procedures, but many of the Vaughn justifications also allude to guidelines which are protected to the extent that disclosure risks circumvention of the law. Is it your view that disclosure doesn't risk of these materials does not risk circumvention of the law, knowing what the different ways that, or the different guidance that has been provided to identify terrorists would not risk circumvention of the law? Your Honor, we primarily briefed the question that the government reframed its argument as focusing on these as techniques and procedures. So just to quote from page 27 of the government's opening brief, it's the government itself claims that while several of these provisions refer to guidelines, they use that term in a different than 70 and they've rested their argument on the fact that these are techniques and procedures. In the rebuttal argument, but assuming that we were to look at this in terms of whether or not they qualify as guidelines, as well as techniques and procedures, what's your response to why they don't risk circumvention to publicly disclose the materials withheld? Your Honor, we rest on other arguments in that section. First of all, that they're not compiled for law enforcement purposes. And second, that many of the redactions are in contextual sections on definition and background material that don't suggest that they're exercising the discretion inherent in guidelines, which are supposed to focus on future policy and conduct. Thank you. Thank you, Your Honor. Thank you very much. And let's see, Ms. Blaine, I think you have reserved three minutes for rebuttal. Yes, thank you, Your Honor. A number of points, and I'll do my best to get them in, and in the three-minute timeline. So taking these points in reverse order, starting with the State Department's withholdings in the FAM, as an initial matter, the State Department withheld not policy in the FAM, as Judge Jacobs is pointing out, there may in fact be policy in the FAM, and there is policy in the FAM. And that's what the State Department has produced. The State Department's logical and plausible declarations explain that what has been redacted does not appear unredacted elsewhere, and contains more specific and technical information than that that was released. And that's at JA-166. What do you say in response to the assertion that definitions cannot be protectable? Your Honor, the State Department has also specifically addressed that. And looking at that page, which is at JA-121, the district court pointed out that the State Department had released a list of factors that would indicate material support for terrorism, but redacted the paragraph preceding that list. And the State Department said that that redacted portion contains identifications for the situations that trigger the process for checking for terrorism-related ineligibilities, and reveals the techniques used to determine whether an individual is ineligible to receive a visa because of their involvement in terrorist activities. That's at JA-66. Is that what your adversary is referring to when she talks about the masking and redacting of definitions? Yes. And the State Department has said that it did not redact definitions. It produced the definitions, but redacted the more specific detailed information that may be surrounded and intertwined with the definitions. So in other words, I'm just looking at, say, JA-121. So what you're saying is that the definitions are sort of, let's say, the framework for these various pages. And under that framework, there are various sort of commentaries or discussions, not just reprinting of statutory terms. And that's the sort of the commentaries or glosses or additional information that happens to be structured in terms of what goes on which page or what falls under which definition. It's the additionals, the value-added that's been blocked off. Well, exactly. Exactly, Your Honor. And of course, agency declarations are entitled to a presumption of good faith. And here, the agency has attested repeatedly that these particular pieces of information that were withheld, and they're relatively small in the context of Volume 9, contain additional more specific concrete techniques for consular officers to use to determine, for example, whether an individual is a target for terrorism. For example, there are directives for consular officers to check certain databases to review non-public sources of information. And vitally, there's information about particular terrorist organizations, consular officers to use to determine whether or not that person is, in fact, associated with that organization. At JA-131 to 33, there's detailed information about the Palestine Liberation Organization. Association with that organization, per se, prevents an individual from being admitted to the United States. If the State Department were to release that information, individuals who are, in fact, associated with the PLO could use that information to tailor their testimony and avoid detection. That is exactly what Section... Sorry, Your Honor. The order that we're reviewing orders ICE to release reasonably segregable portions of that memo that reflect current immigration policy. What is wrong, what is erroneous about that part of the order? So, Your Honor, just to be clear, I was focusing on the USCIS. No, I understand. Okay, so we're talking about the ICE memo. I'm transitioning. We don't have much time. I got it. I'll be super fast. So, the district court ordered that ICE disclose current immigration policy, not segregate factual information from the memo. That is not what the district court ordered. Instead, the district court ordered that ICE go through the memo again, take a second look, and disclose whatever may be working law. ICE did that. ICE went through, did another review, and informed the plaintiffs that nothing in there contains working law because, as this court has held twice in 2019, working law must bind the agency or it must bind the public. And there is no indication here, in fact, every indication to the contrary, that this memo does anything that binds the agency. It is... So, in your view, the agency has already complied with that portion of the order? Yes, the agency looked for working law, complied with that portion of the order, and informed the plaintiffs that there is nothing in here that could possibly be conceived or determined to be working law. So, is there anything for us to do with respect to that part? No, Your Honor. We respectfully submit that the court should reverse the district court's order if, in fact, the district court ordered. And it's not clear that ICE released other portions of the memo. It seems like that's not what the district court did. The district court ordered the ICE to do exactly what it did, and ICE complied. So, I understand the plaintiffs to be arguing that ICE didn't meet its burden under Exemption 5, but that's not clearly what the... No, but this is your appeal. This is your appeal. Yes. So, if your view is the district court ordered ACTS, we complied with ACTS, what are you appealing? Well, because, Your Honor, the district court is not respectfully, perfectly clear about its decision regarding the ICE memo because... Well, but isn't the next step for the move-ins for Knight to go back in the district court and say, this isn't a full response to your order, Judge? The judge will either say that's correct, or he'll say, no, I'm satisfied they complied. And whichever of you is unhappy with that can say, this is your appeal, and what I'm hearing is that you're saying you complied. Well, Your Honor, there's one portion of the order about the ICE memo where the court determines that ICE has failed to demonstrate that this document is deliberative. He says that ICE has not demonstrated that there are employee opinions, that there's a personal opinion of the writer. That is incorrect. And so, that is the portion that we are appealing. To the extent the court meant then for ICE to disclose the entirety of the memo because it hadn't met its threshold exemption five burden, then that was error. Okay. Could you just point me to where in the decision, just a page in the special appendix where I would find the latest word of the district court on the memo? Yes, Your Honor. It is pages SPA 36 to 37. And, you know, he concludes on page 37, having concluded on page 36 that it's not deliberative, accordingly, any reasonably segregable sections of the record reflecting working law must be released. And earlier in the decision, he explains what he means by working law, which is current immigration policy. All right. Just quickly, I know I'm out of time, so I'm not quite sure how much more I can cover. I'll give you 30 more seconds to wrap up. Okay. Fine. Thank you. USCIS, the materials here that are being withheld, these questions are specialized because they are in the context of where they are. They are the government's playbook. They identify the rationale for the questions. It's not just the questions at issue. It falls within why an immigration officer is asking these questions, what they're looking for, and what they are screening for and can render someone ineligible for based on. So, Your Honor, the agencies respectfully request that this court reverse the district court, because these documents really are how consular officers and immigration officers screen for terrorism ties, enforcing Section 212 of the INA. These materials easily could lead our enemies, as Judge Nardini was saying earlier, our enemies would love to have this playbook. Our enemies would love to know what immigration officers are screening for and how to get around terrorism-related inadmissibility bars. So, respectfully request the court reverse the district court. Thank you very much. Thank you to both counsel. That was very well argued, and we thank you for your assistance. We will reserve decision.